**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PETERSON MANUEL,** | : | **CIVIL ACTION NO. 1:15-CV-274** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **NRA GROUP, LLC** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Peterson Manuel ("Manuel") commenced this action against NRA Group, LLC ("NRA") under the Telephone Consumer Protection Act, 47 U.S.C. § 227, asserting that NRA willfully placed non-emergency calls to Manuel's cell phone using an "automatic telephone dialing system" without Manuel's consent.  (Doc. 1).  Before the court are the parties' respective cross-motions (Docs. 20, 21) for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The court will grant Manuel's motion in part and deny NRA's motion.

I. **Factual Background and Procedural History**[1]

NRA is a revenue recovery service operating out of Harrisburg,

Pennsylvania. (Doc. 23-4, Sarver Dep. 12:10-22, 14:6-8, Nov. 3, 2015 ("Sarver

Dep.")). NRA employs approximately eighty collection agents who are tasked with

contacting consumers regarding delinquent payments. (Sarver Dep. 13:14-17,

16:17-21). In October 2011, NRA acquired a collection account from the City of Fort

Lauderdale, Florida for an outstanding parking ticket in Manuel's name. (Doc. 22

¶¶ 1-2; Doc. 46-1 ¶¶ 1-2).

NRA enlisted third-party information provider Experian Metronet Skiptrace

("Experian") to procure a phone number for Manuel. (See Doc. 22 ¶ 3; Doc. 34 ¶ 7;

Doc. 40 ¶ 7; Doc. 46-1 ¶ 3). According to NRA, in May 2012, Experian supplied

a phone number which it represented as Manuel's residential landline. (See

Doc. 22 ¶¶ 4-5; Doc. 23-2 at 10; Doc. 40 ¶ 7). The number instead corresponds to

Manuel's cell phone. (Doc. 34 ¶¶ 4-5, 8; Doc. 40 ¶¶ 4-5, 8). NRA's "cellular

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 22, 34, 40, 46-1). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

telephone scrub," which ascertains mislabeled cell phone numbers in NRA's system, did not identify Manuel's cell phone number as such until June 23, 2014. (Doc. 22 ¶¶ 41-42; Doc. 46-1 ¶¶ 41-42).

Between May 31, 2012 and June 17, 2014, NRA placed 149 collection calls to Manuel's cell phone.  (Doc. 22 ¶¶ 6-7; Doc. 46-1 ¶¶ 6-7; <u>see</u> Doc. 23-1; Doc. 23-2 at 8; Doc. 34 ¶ 9).  Manuel received voicemails from NRA which contained protracted silence and terminated with the sound of a "click."  (Doc. 34 ¶ 38; Doc. 40 ¶ 38). None of the voicemails included live messages from NRA representatives.  (Doc. 34 ¶ 39; Doc. 40 ¶ 39).  Manuel asserts that upon answering certain of NRA's calls, he experienced a conspicuous delay before speaking with a collection agent.  (Doc. 23-3, Manuel Dep. 28:22-30:10, Jan. 6, 2016 ("Manuel Dep.")).  Manuel contends that during a conversation with an NRA representative "[m]aybe a couple of months . . . after [he] . . . started getting the calls," he expressed a desire for NRA to "stop calling [his] . . . cell phone."  (<u>Id.</u> 23:1-9).  Manuel does not recollect whether he placed or received this call.  (<u>Id.</u> 23:7-16).

NRA initiated 146 of the 149 phone calls to Manuel using Mercury Predictive Dialer ("Mercury Dialer"), an electronic dialing device designed to expedite revenue recovery campaigns.[2]  (See Doc. 22 ¶¶ 11-12; Doc. 34 ¶¶ 10-12; Doc. 38, CR Software Mercury Predictive Dialer Manual at 377, May 17, 2012; Doc. 40 ¶¶ 10-12; Doc. 46-1 ¶¶ 11-12; Sarver Dep. 28:12-30:13, 37:1-16, 39:2-15; 58:16-20).  NRA operates Mercury Dialer in tandem with a collection software called Platinum System.  (Sarver Dep. 19:7-10, 30:5-13).  On a daily basis, NRA's Director of Collections, Charlene Sarver ("Sarver"), enters campaign parameters into Platinum System, delineating which accounts Mercury Dialer may access and call that day. (Doc. 22 ¶¶ 19-20; Doc. 46-1 ¶¶ 19-20).

Mercury Dialer operates in three modes: (1) predictive; (2) power; and (3) non-predictive agent, or preview.  (Doc. 34 ¶ 19; Doc. 40 ¶ 19).  Sarver testified in her deposition that NRA uses Mercury Dialer's predictive mode in the following manner:

> Q:    So, when [Mercury Dialer] is in predictive mode can you sort of tell me, in your own words, how it works?

---

[2] NRA denies "that it made exactly 146 phone calls" to Manuel through Mercury Dialer, charging that Manuel fails "to procure any evidence that each call listed in the Fact Sheet accurately reflects a phone call that was made."  (Doc. 40-1 at 13).  NRA appears to disavow its own record produced to Manuel in discovery; the "Fact Sheet" lists calls from NRA to Manuel during the relevant time period. (See Doc. 23-1, Peterson Manuel Fact Sheet ("Fact Sheet")).  NRA presents no evidence to undermine the accuracy of the Fact Sheet.  In fact, NRA confirms in its response to Manuel's interrogatories that "[t]he dates of every call NRA made to [Manuel] . . . are listed in the Fact Sheet."  (Doc. 23-3 at 8).  NRA's abstruse remonstration is unavailing.  Uncontroverted record evidence establishes that Mercury Dialer placed 146 calls to Manuel.  See FED. R. CIV. P. 56(c).

A:     When a collector . . . log[s] into . . . Platinum System[,] they tell it they want to go into the dialer system, and from the dialer system they access whatever work . . . they are told to do for the day, and once they are ready to . . . start working, they hit the F4 key, and the dialer will dial a call for them.

Q:     Okay.  Do they have to hit the F4 key for every call?

A:     Correct.

        . . .

Q:     [W]hen [Mercury Dialer] dials in [p]redictive mode, who physically makes the call, the collector or the dialer?

A:     The dialer.

Q:     Okay.  And is that call dialed before the collector presses F4 or after?

A:     In [p]redictive it attempts to predict when the next person will hit F4.

Q:     Okay.  So, it predicts when the next person will hit F4, and then someone hits F4, and it will route that call to that person?

A:     It will give them a call, yes . . . .

        . . .

Q:     In [p]redictive mode account [sic] collectors choose to make a call to a particular account?

A:     No.

Q:     So, the dialer adheres to whatever campaign parameters you set for the particular day?

A:     That's correct.

Q:    Okay.  Now . . . let us say someone answers a call
      that is made with [Mercury Dialer] in [p]redictive
      mode, what — does the person answer, and then it
      is routed to the next person who hits F4?

A:    When the person hits F4, if it connects a call, it is
      just like you would say hello, and you are there.

Q:    And what happens in [p]redictive mode when
      [Mercury Dialer] gets an answering machine?

A:    We drop it.

Q:    Does the collector drop it or the dialer drops it?

A:    The dialer drops it.

(Sarver Dep. 30:1-17, 32:6-19, 33:13-34:10).

With respect to the distinction between predictive mode and power mode,
Sarver testified that "[p]ower mode doesn't try to predict when someone is going to
hit the F4 key."  (Id. 34:14-17).  Sarver explained that each individual call placed in
power mode is triggered by a collection agent pressing F4.  (Id. 34:18-35:8).  Finally,
in contrast with predictive and power modes, preview mode enables collection
agents to call specific phone numbers listed in Platinum System.  (Doc. 22 ¶ 31; Doc.
34 ¶ 31; Doc. 40 ¶ 19; Doc. 46-1 ¶ 31).  Agents effectuate calls in preview mode by
manually selecting a number and pressing F4, prompting Mercury Dialer to place
the requested call.  (Doc. 22 ¶ 34; Doc. 46-1 ¶ 34).

Sarver's testimony confirmed that in all three modes, the number of calls
initiated by Mercury Dialer "is directly tied to the number of people . . . at a desk
that are hitting the F4 key" and that no calls are "processed for [a] collector without
hitting the F4 key."  (Sarver Dep. 57:12-18, 58:3-5).  NRA's call records for Manuel

identify in each instance whether Mercury Dialer placed the call, but do not specify its operational mode.  (Id. 38:17-25; see Fact Sheet; Doc. 34 ¶ 32; Doc. 40 ¶ 32).

Manuel submitted a complaint to the Consumer Financial Protection Bureau regarding NRA's calls to his cell phone.  (Doc. 34 ¶ 40; Doc. 40 ¶ 40).  On June 23, 2014, the Consumer Financial Protection Bureau notified NRA of Manuel's grievance.  (Doc. 34 ¶ 41; Doc. 40 ¶ 41).  NRA thereafter terminated all phone communications with Manuel.  (Doc. 22 ¶ 42; Doc. 46-1 ¶ 22).

Manuel initiated the action *sub judice* with the filing of a complaint (Doc. 1) on February 6, 2015.  Therein, Manuel asserts a single statutory claim, to wit: that NRA knowingly violated the Telephone Consumer Protection Act by calling Manuel's cell phone using an automatic telephone dialing system without Manuel's consent.  47 U.S.C. § 227; (see Doc. 1 ¶¶ 14-22).  The parties timely filed the instant cross-motions and supporting papers.  (Docs. 20-25, 34, 36-37, 40, 42-44, 46).  The motions are fully briefed and ripe for disposition.

## II.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Federal Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2014).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.  **Discussion**

The parties' Rule 56 *argumenta a contrario* converge upon a discrete inquiry: whether NRA's Mercury Dialer constitutes an automatic telephone dialing system as defined by the Telephone Consumer Protection Act.  47 U.S.C. § 227.  Manuel contends that Mercury Dialer qualifies as such by virtue of its capacity to place calls

independent of contemporaneous human intervention.[3]  (See Doc. 34-1 at 11-14;

Doc. 44 at 2-9).  Manuel seeks entry of judgment in his favor and urges the court to

hold, as a matter of law, that NRA willfully violated the Telephone Consumer

Protection Act, entitling Manuel to treble damages.  (See Doc. 34-1 at 19-21; Doc.

44 at 13-15).

NRA also moves the court for summary judgment as to Manuel's claim,

counterpoising that "no call was placed to [Manuel] . . . *without* human

intervention."  (Doc. 23 at 10 (emphasis added); see id. at 11-16).  The court will

analyze the parties' diametric arguments through the prism of the Telephone

Consumer Protection Act and authoritative guidance propounded thereupon by the

Federal Communications Commission ("FCC").  See 28 U.S.C. § 2342(1).

---

[3] Manuel additionally urges the court to apply nonmutual offensive collateral
estoppel based on the decision in Brown v. NRA Group, LLC, No. 6:14-CV-610-
ORL-31, 2015 WL 3562740 (M.D. Fla. June 5, 2015).  Plaintiff in Brown complained
of 35 calls placed to her cell phone by NRA's Mercury Dialer between September
30, 2013 and January 8, 2014.  Id. at *1.  The court granted summary judgment in
plaintiff's favor, holding that Mercury Dialer qualifies as an automatic telephone
dialing system.  Id. at *4.  Application of nonmutual offensive collateral estoppel
rests in the sound discretion of the trial court and is "subject to an overriding
fairness determination."  Burlington N. R.R. Co. v. Hyundai Merch. Marine Co., 63
F.3d 1227, 1232 (3d Cir. 1995) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322,
326 (1979)); see also Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d
244, 248-49 (3d Cir. 2006).  Assuming *arguendo* that the requisite elements of issue
preclusion are otherwise satisfied, the court declines to apply the doctrine herein.

NRA conceded in Brown, *first*, that it intended to contact a person other than
plaintiff, and *second*, that plaintiff notified NRA of its error shortly after the call
campaign commenced.  Brown, 2015 WL 3562740, at *1.  Moreover, NRA faces up to
$219,000 in damages in the instant matter, as compared to a maximum of $52,500 in
Brown.  See id. at *1; (Doc. 1 ¶ 22).  The foregoing factual distinctions suggest that
NRA "may have had little incentive to defend vigorously" against the allegations in
Brown.  Burlington, 63 F.3d at 1232 n.7 (quoting Parklane, 439 U.S. at 330).  Hence,
the decision in Brown regarding NRA's Mercury Dialer will not be granted
preclusive effect.

### A.    Automatic Telephone Dialing System

The Telephone Consumer Protection Act proscribes the placement of "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).  The Act defines "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  Id. § 227(a)(1).  The FCC interprets the term "capacity" to include both present and potential abilities of dialing equipment.  See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7971-74 (July 10, 2015) (hereinafter "2015 FCC Ruling").

The FCC has issued multiple declaratory rulings holding that predictive dialers fall within the statutory definition of automatic telephone dialing system.  See id.; In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 23 FCC Rcd. 559, 566-67 (Jan. 4, 2008) (hereinafter "2008 FCC Ruling"); In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14091-92 (July 3, 2003) (hereinafter "2003 FCC Ruling").  Therein, the FCC explains that predictive dialer hardware, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."  2003 FCC Ruling at 14091.  A dialing system is predictive *in*

*hoc sensu* if it has "the capacity to dial numbers without human intervention." Id. at

14092; see also 2015 FCC Ruling at 7972-75; 2008 FCC Ruling at 566.

Whether a dialing system has the capacity to operate free from human

intervention "is specific to each individual piece of equipment" and must be

determined on a case-by-case basis. 2015 FCC Ruling at 7975. The apposite inquiry

focuses on the precise moment calls are placed; a person's antecedent entry of

campaign parameters into dialer hardware or companion software is irrelevant.

See Daubert v. NRA Grp., LLC, No. 3:15-CV-00718, 2016 WL 3027826, at *15 (M.D.

Pa. May 27, 2016); Morse v. Allied Interstate, LLC, 65 F. Supp. 3d 407, 410 (M.D. Pa.

2014); Sterk v. Path, Inc., 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014). "Point and click"

systems requiring users to manually initiate each call uniformly necessitate human

involvement. See, e.g., Estrella v. Ltd Fin. Servs., LP, No. 8:14-CV-2624-T-27AEP,

2015 WL 6742062, at *2-4 (M.D. Fla. Nov. 2, 2015); Gragg v. Orange Cab Co.,

995 F. Supp. 2d 1189, 1193-94 (W.D. Wash. 2014). Conversely, dialers with the

capacity to initiate multifarious calls prospectively, before agents become available,

fall within the ambit of the Act. See, e.g., Morse, 65 F. Supp. 3d at 410-11; Sterk, 46

F. Supp. 3d at 819-20; Moore v. Dish Network L.L.C., 57 F. Supp. 3d 639, 654-55

(N.D. W. Va. 2014).

In the matter *sub judice*, Manuel asserts that Mercury Dialer qualifies as a

predictive dialer—rendering it an automatic telephone dialing system under the

Telephone Consumer Protection Act—because it "has the capacity to dial numbers

from lists without human intervention" when operating in predictive mode. (Doc.

44 at 1; see id. at 3-5). *Per contra*, NRA contends that Mercury Dialer "is incapable

11

of making a phone call without a collector first hitting the 'F4' key." (Doc. 40-1 at 6). Both parties direct the court to Sarver's deposition testimony as support for their respective positions. (See Doc. 23 at 14-16; Doc. 34-1 at 13-14; Doc. 40-1 at 6-7; Doc. 44 at 2-8). NRA further submits that Manuel's failure to proffer expert testimony is fatal to his Rule 56 entreaty, positing that Mercury Dialer "is a complex piece of machinery that is almost impossible to understand without an expert explaining the nuances of the machine." (Doc. 40-1 at 8; see Doc. 23 at 16-19; Doc. 40-1 at 1-5). The court is compelled to conclude that the record admits of no plausible defense to Manuel's arguments. Envisaged in the light most favorable to NRA, uncontroverted evidence establishes that Mercury Dialer is capable of placing calls without human intervention.

NRA misconstrues the provenance and substance of Sarver's deposition testimony. Sarver explained therein that in predictive mode, Mercury Dialer "attempts to predict when the next [collection agent] . . . will hit F4" by placing a series of calls in advance. (Sarver Dep. 32:6-19). Sarver's statements illustrate that the F4 key merely signals an agent's availability, at which point Mercury Dialer transfers a preexisting live connection if one is queued. Sarver further testified that said predictive calls terminate automatically upon reaching an answering machine. (Id. 33:13-34:10). In this instance, no human involvement is required at any point during the call.

The court perceives a significant difference between predictive mode, one the one hand, and power and preview modes, on the other. In the latter operational settings, collection agents must affirmatively prompt Mercury Dialer to place each

individual phone call.  (See Sarver Dep. 34:14-35:8; Doc. 22 ¶ 31; Doc. 34 ¶ 31; Doc. 40 ¶ 19; Doc. 46-1 ¶ 31).  Contrastively, it is clear that Mercury Dialer initiates calls in predicative mode without human intervention.  (See Sarver Dep. 32:6-19, 33:13-34:10).  NRA miscomprehends this key distinction and presents no evidence to the contrary.

Finally, NRA's supplication that expert testimony is a desideratum misses the mark.  (See Doc. 23 at 16-19).  NRA fails to cite or acknowledge factually parallel cases which have proceeded without the benefit thereof.  See, e.g., Gillard v. Receivables Performance Mgmt., LLC, No. 14-02392, 2015 WL 3456751, at *4 (E.D. Pa. June 1, 2015); Moore, 57 F. Supp. 3d at 651-55.  More is required for NRA to survive summary judgment.

The court concludes that there is no genuine issue regarding whether Mercury Dialer is capable of placing calls without human intervention; hence, Mercury Dialer constitutes an automatic telephone dialing system.  Manuel is entitled to judgment as a matter of law pursuant to the Telephone Consumer Protection Act claim.

### B.    Treble Damages

Manuel additionally seeks summary judgment on the issue of treble damages. (See Doc. 34-1 at 19-21; Doc. 44 at 13-15).  Treble damages are available under the Telephone Consumer Protection Act when a defendant violates the Act "willfully or knowingly."  47 U.S.C. § 227(b)(3).  Neither the Act nor FCC guidance defines these terms.  Courts have generally resolved this ambiguity by requiring evidence of volitional conduct for each element of liability, irrespective of any intent to

transgress the Act's prohibitions.  See <u>Lary v. Trinity Physician Fin. & Ins. Servs.</u>, 780 F.3d 1101, 1107 (11th Cir. 2015); <u>Davis v. Diversified Consultants, Inc.</u>, 36 F. Supp. 3d 217, 226-27 (D. Mass. 2014) (collecting cases); <u>cf.</u> <u>Echevvaria v. Diversified Consultants, Inc.</u>, No. 13-CIV.4980-LAK-AJP, 2014 WL 929275, at *9 (S.D.N.Y. Feb. 28, 2014).  <u>But</u> <u>see</u>, <u>e.g.</u>, <u>Texas v. Am. Blastfax, Inc.</u>, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001).

The instant record is unsettled as to whether NRA deliberately called Manuel's cell phone as opposed to his landline.  Manuel asserts broadly that "NRA has not produced any evidence that it took proactive steps to determine whether it was calling a cellular telephone."  (<u>See</u> Doc. 46 at 16-17).  Manuel further submits that he notified NRA of its solecism in this regard approximately two months after the calls commenced.  (<u>See</u> Manuel Dep. 23:1-9).  NRA flatly refutes this contention, claiming to be ignorant of its error until June 23, 2014, when NRA's cellular telephone scrub purportedly identified Manuel's phone number as incorrectly classified.  (<u>See</u> Doc. 22 ¶¶ 41-42; Doc. 40-1 at 15; Doc. 46-1 ¶¶ 41-42).  NRA additionally ripostes that Experian tendered Manuel's number to NRA as a "residential landline," but provides no documentary evidence as support.  (<u>See</u> Doc. 22 ¶ 5; Doc. 46-1 ¶ 5).  It is for the jury and not a judge to measure the veracity of these competing assertions.  Judgment on Manuel's request for treble damages is premature.

## IV.    <u>Conclusion</u>

The court will grant Manuel's motion (Doc. 20) in part and deny NRA's

motion (Doc. 21) pursuant to Federal Rule of Civil Procedure 56.  An appropriate

order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        August 5, 2016